**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:16-cr-00169 |
| | ) | |
| v. | ) | Chief Judge Mark R. Hornak |
| | ) | |
| JANAY LANEICE BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPINION</u>**

**Mark R. Hornak, Chief United States District Judge**

On September 13, 2019, this Court sentenced Ms. Janay Brown to a term of imprisonment of two (2) years and (2) days, and a term of supervised release of four (4) years. (ECF No. 57.) Last year, Ms. Brown filed a *pro se* Motion for Compassionate Release. (ECF No. 61.) Upon receipt of the Motion, the Court appointed counsel for Ms. Brown, who sought and was granted several extensions of time to file a counseled Motion on her behalf. In January 2021, counsel for Ms. Brown filed such a counseled Motion for a Reduction of Sentence Pursuant to 18 U.S.C § 3582(c)(1)(A)(i). (ECF No. 81.) At that time, Ms. Brown was imprisoned at FPC Alderson. In February 2021, she was moved to Fairview Residential Reentry Center ("Fairview RRC") in Washington, D.C.

The record before the Court shows that Ms. Brown has a BMI that qualifies as "obese" and has chronic, moderate to severe asthma, a condition for which she takes multiple daily medications and that she has battled since childhood. Her anticipated release date from federal custody is August 15, 2021. According to the Director of Fairview RRC, Ms. Brown will be eligible for home confinement under the auspices of the Bureau of Prisons ("BOP") even sooner than that, on June

1

4, 2021. (ECF No. 102, at 32.) The record does not reflect any reason that such would not occur on that date.

The Court concludes that Ms. Brown's Motion is properly before it, that her medical conditions rise to an "extraordinary and compelling" level, and that consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) supports a reduction of Ms. Brown's sentence. In sum, release from a BOP custodial setting is now warranted on the record before the Court. Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF Nos. 61 and 81 is GRANTED subject to the conditions set forth below.

## I.      **<u>BACKGROUND</u>**

On July 10, 2017, Ms. Janay Brown pleaded guilty to two (2) drug-related counts and two (2) gun-related counts. (ECF No. 30.) This Court sentenced Ms. Brown to twelve (12) months and one (1) day at Counts 1, 2, and 3, to run concurrently, and twelve (12) months and one (1) day at Count 4, to run consecutive to the sentence at Counts 1, 2, and 3. (ECF No. 57.) The Court further sentenced Ms. Brown to a total of four (4) years of supervised release. (*Id.*)

In June 2020, Ms. Brown wrote a letter to the Court requesting that the Court grant her release on home confinement due to her chronic asthma and risk of contracting COVID-19. (ECF No. 61.) The Court then appointed counsel to represent Ms. Brown in the matter. (ECF No. 62.) Counsel for Ms. Brown had difficulty accessing Ms. Brown's medical records, which counsel informed the Court were necessary to support Ms. Brown in filing a counseled compassionate release motion. (*See, e.g.*, ECF No. 69.) As a result of these delays in obtaining the medical records, counsel for Ms. Brown did not supplement Ms. Brown's *pro se* filing until January 2021. (ECF Nos. 81, 83.)

In the counseled Motion for Release, counsel for Ms. Brown argued that extraordinary and compelling circumstances for release exist primarily because Ms. Brown has moderate to severe asthma. (ECF No. 81.) Counsel for Ms. Brown further contended that release was warranted under the § 3553(a) factors because Ms. Brown's rehabilitative efforts and proposed release plan made the risk of Ms. Brown re-engaging in criminal activity very low. (*Id.*)

The Government opposed the Motion. (ECF No. 86.) The Government argued that medical records showed that the BOP facility was properly caring for Ms. Brown, including with regards to her asthmatic needs. (*Id.*) The Government also argued that the remainder of her two-year prison sentence—at that point about six (6) months—was still necessary to fulfill the original purposes of the sentence. (*Id.*) At the Court's request, counsel for the Government obtained and then filed Ms. Brown's medical records under seal on the docket. (ECF Nos. 87, 88, 89.) Counsel for Ms. Brown then filed a reply. (ECF No. 90.)

One piece of evidence in dispute between the parties was Ms. Brown's BMI. Counsel for Ms. Brown asserted, without evidentiary support, that Ms. Brown might be obese, which would enhance her argument for "extraordinary and compelling" circumstances. (ECF No. 81.) In response, the Government informed the Court that the medical records showed that Ms. Brown had a BMI that qualified as "obese," but the Government contended that this data point "should not impact the Court's analysis" because the records did not show the basis for the BMI. (ECF No. 88, at 2.) The Court entered an Order asking counsel for the Government to request the BOP to assess Ms. Brown's BMI. (ECF No. 91.) In accordance with that Order, Ms. Brown was then scheduled for a medical appointment which revealed her current BMI was indeed in the "obese" range at 32. (ECF No. 98.)

At that time, counsel for the Government also informed the Court that Ms. Brown had been moved to Fairview RRC, a women's residential reentry center in Washington, D.C. (ECF No. 92.)[1] Counsel for Ms. Brown filed addendums to the Motion informing the Court that Ms. Brown was still pursuing compassionate release despite being moved to Fairview RRC. (ECF Nos. 93, 96.)

The Court held oral argument and an evidentiary hearing on April 5, 2021. (ECF No. 100.) Ms. Brown and Ms. Shari McCoy, the Director of Fairview RRC, testified, and the Government introduced seventeen (17) exhibits into the record, including a form indicating that Ms. Brown declined to consent to COVID-19 vaccination. (*Id.*) After the hearing, the Court directed the Probation Office to complete an expedited assessment of a potential release plan as to Ms. Brown. (*Id.*) Both parties filed post-hearing supplemental briefs. (ECF Nos. 104, 105.)

One week after the hearing, counsel for Ms. Brown filed a Notice on the docket informing the Court that: (1) after the hearing, other inmates and staff angrily confronted Ms. Brown about the testimony she gave about Fairview RRC; (2) two days after the hearing, Ms. Brown's room was "tossed and searched" with the contents left haphazardly strewn about, which had not happened prior to that date; and (3) as of April 11, 2021, Ms. Brown was given a roommate at Fairview RRC for the first time. The Court promptly scheduled a telephonic status conference to discuss the allegations set forth in the Notice, which Ms. Brown's counsel confirmed on the record based on representations made to him by Ms. Brown. (ECF No. 109.) Following the status conference, counsel for the Government was authorized to file a response to the Notice, which he did. (ECF No. 110.)[2] The matter is ripe for disposition.

---

[1] According to Ms. Brown's testimony at the oral argument/hearing on April 5, 2021, Ms. Brown was moved to Fairview RRC on February 25, 2021. (ECF No. 102, at 19.)

[2] The Court recognized that the assertions in the Notice filed by Ms. Brown's counsel are not sworn testimony, so the Court convened a status conference with all counsel to provide Ms. Brown's counsel the opportunity to confirm on the record the representations he had made (which he did) and the Court's understanding of them. Those assertions related solely to the alleged actions of the Fairview RRC, and do not involve the advocacy of counsel for the United

## II.   **LEGAL STANDARD**

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III.   **DISCUSSION**

After considering the relevant factors, the Court finds that Ms. Brown's Motion is properly before it, including her COVID-19-related concerns. Additionally, the Court finds that Ms. Brown's medical conditions of obesity and chronic, moderate to severe asthma, as exacerbated by her particularized risk for severe illness should she contract the COVID-19 virus, rise to an "extraordinary and compelling" level. In then considering the § 3553(a) factors as the Court is obligated to do, the Court finds that release of Ms. Brown at this point is consistent with the purposes of sentencing in this case, and as such, compassionate release is appropriate at this time.

---

States before this Court.  While troubling, the allegations relative to the timing and vigor of the search of Ms. Brown's room are not relevant to the disposition of the merits of her Motion and at this point remain allegations. Conversely, the fact that Ms. Brown's housing status was modified is, for the reasons noted below, both of record and germane to the disposition of her Motion.

A. **Administrative Exhaustion**

In order to consider the merits of the Defendant's Motion, the Court must first determine whether Ms. Brown has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. And the Third Circuit has confirmed that either of § 3582(c)(1)(A)'s options (acting independently of one another) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Court concludes that Ms. Brown has fully exhausted her administrative request. On May 18, 2020, Ms. Brown submitted a request for compassionate release to the Warden of FPC Alderson, the BOP facility where Ms. Brown then resided. (ECF No. 81-1.) The Warden considered Ms. Brown's concerns about contracting COVID-19 in light of her medical conditions and denied her request on May 22, 2020. (*Id.*) The Government does not contest exhaustion. (ECF No. 86, at 3–4.) Because more than thirty (30) days have passed since her request was submitted to the BOP, the Court concludes that Ms. Brown has exhausted her administrative filing obligations and the Motion is now properly before the Court.

### B.  **"Extraordinary and Compelling" Reasons**

Next, the Court must determine whether Ms. Brown's medical conditions, as exacerbated by the still ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level, such that consideration of release from prison would be permitted by § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines"), since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

A question that arises in this matter, and has arisen in other similar cases, is whether, and if so to what degree, the current provisions of the Guidelines and relevant Application Notes at U.S.S.G. § 1B1.13 promulgated by the Sentencing Commission in 2018 are applicable in consideration of this Motion. As a general matter, this Court has been of the view that those provisions of the Guidelines are informative but not controlling and in any event advisory. *See, e.g.*, *United States v. Davidson*, No. 16-00139, 2020 WL 4877255, at *17–18 (W.D. Pa. Aug. 20, 2020). Over the past few months, a number of the regional Courts of Appeal have considered this issue and all but one have held that those Guidelines provisions are not controlling and limiting in the consideration of compassionate release motions. *See United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) (*per curiam*); *United States v. Shkambi*, No. 20-

40543, 2021 WL 1291609, at *2–4 (5th Cir. Apr. 7, 2021); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021); *United States v. McCoy*, 981 F.3d 271, 281–84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020); *but see United States v. Bryant*, No. 19-14267, 2021 WL 1827158, at *13 (11th Cir. May 7, 2021) (holding that § 1B1.13 is an applicable, binding policy statement for all Section 3582(c)(1)(A) motions).[3] And in this case and in others in this Court, it has been the position of the United States that § 1B1.13 is so limiting, notwithstanding that those provisions have not been considered or updated by the Sentencing Commission since Congress passed and the President signed into law the First Step Act. *See id.*

This issue is now before our Court of Appeals in a significantly different and perhaps more consequential permutation in *United States v. Andrews*, in which the key issue before that Court is whether a court's discretion to determine and define "extraordinary and compelling reasons" is constrained by U.S.S.G. § 1B1.13 and its commentary, specifically in circumstances when such are asserted to exist due to a gross disparity between a sentence originally imposed and a sentence

---

[3] This Court finds particularly persuasive the portions of Judge Martin's dissent in *Bryant* that observe that applying U.S.S.G. §1B1.13 and its Application Note 1(D) to compassionate release motions filed not by the BOP but by a defendant would result in an unauthorized sub-delegation of authority to the BOP. *Bryant*, 2021 WL 1827158, at *22. The actual text of the Guideline authorizes the Court when such a motion is pending to reduce a sentence if "extraordinary and compelling reasons warrant the reduction." U.S.S.G. §1B1.13(1)(A). But it is only in Application Note 1 (and not in the Guideline itself) that the Sentencing Commission outlined such reasons definitionally, closing with a "catch all" provision, "Other Reasons," in subsection (D). That Application Note provides that such conditions could exist if the Director of the BOP determined that they existed (without any Guideline or Application Note assistance provided) *as to that particular defendant in that particular case*.

This Court finds persuasive the *Bryant* dissent's assessment that giving that provision conclusive force as to a defendant-filed motion would be both an impermissible sub-delegation of authority to the BOP, and would be counter to the purposes of the First Step Act which was aimed at removing the BOP's exclusive role as to such motions, since in a circular fashion it in effect flips the release decision back to the BOP and away from the Court. And beyond that, given that the Guideline itself does not endeavor to define the term "extraordinary and compelling" at all, instead leaving it to an Application Note that drops most of that definitional work into the lap of the Director of the BOP, this Court harbors meaningful doubt that such an approach, and the Application Note itself, would retain vitality in light of the *en banc* decision of our Court of Appeals in *United States v. Nasir*, 982 F. 3d 144, 156–60 (3d Cir. 2020), and its limitations on when the text of an Application Note may permissibly expand the reach of the Guideline itself.

that would be imposed today for the same crime. 480 F. Supp. 3d 669 (E.D. Pa. 2020), *appeal docketed,* No. 20-2768 (3d Cir. Sep. 4, 2020).

This case instead involves a request for relief on the basis of the Defendant's current medical conditions. Although it appears that the central issue in *Andrews* is broader and perhaps of greater reach than the central issue in this case, the involved statutory and Guidelines provisions suggest that a defendant's medical conditions is a topic central to the principles that have animated the concept of such release from its first appearance in the law. For our purposes, the only issue that need be addressed and resolved now is whether the referenced Guidelines provisions are controlling and therefore set and limit the scope of the factors that the Court may consider. To that extent, we join the view of the strong majority of the decisions noted above in concluding that the provisions of U.S.S.G. § 1B1.13 and its Application Notes are not limiting in deciding this issue in the context presented here. The provisions of U.S.S.G. § 1B1.13 and its Application Notes do not serve as a binding limitation on the factors or information that this Court may consider in deciding this specific Motion on the grounds presented in this case, but the Court will nonetheless consider them as an advisory part of its analysis in determining the issue now before the Court.

Particular to Ms. Brown's situation, the Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of non-terminal medical conditions that can rise to an "extraordinary and compelling" level. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii).

The Court finds that the combination of Ms. Brown's medical conditions, paired with the additional risks that she faces due to the still ongoing COVID-19 pandemic, would rise to an "extraordinary and compelling" level pursuant to the "non-terminal" option.

Ms. Brown has at least two (2) conditions that, according to the Centers for Disease Control and Prevention ("CDC"), "can" make her more likely to get severely ill from COVID-19: moderate to severe asthma and obesity. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Apr. 29, 2021), https://bit.ly/3iZBI5M. The medical records also show that since February 2020, Ms. Brown has had multiple elevated systolic blood pressure readings, which the CDC also says can make a person more likely to get severely ill from COVID-19. *See id.*; *see also High Blood Pressure Symptoms & Causes*, Ctrs. for Disease Control & Prevention (last updated May 19, 2020), https://bit.ly/3szhepa. (*See, e.g.*, ECF No. 89-2, at 6; ECF No. 98-1.)

The severity and nature of Ms. Brown's asthma is well-documented in the record, and in the Court's experience as gleaned from other similar cases that have come before the Court, is out of the ordinary in terms of persistence, duration, and severity. The medical records show that Ms. Brown suffers from moderate to severe asthma, a point the Government concedes. (*See* ECF No. 104, at 2.) Indeed, as recently as March 2021, a medical professional treating Ms. Brown determined that she had "moderate persistent asthma" and suffered from shortness of breath. (ECF No. 98-1.) Ms. Brown has suffered from chronic, moderate to severe asthma since childhood. (ECF No. 35, at 15.) She requires consistent care and regular management over her asthma because she is plagued by daily and unrelenting symptoms, including shortness of breath, wheezing, and chest tightness. She is currently prescribed four (4) medications to treat her asthma, including Advair and Albuterol. (*See, e.g.*, ECF No. 98-1; ECF No. 89-1, at 11.) Ms. Brown testified that she is

10

currently on three (3) different inhalers and is also taking allergy medicine in the hopes that it will help stop her asthma from flaring up as it usually does for her during this time of year. (ECF No. 102, at 16.) She uses her inhalers daily. (*Id.* at 5.) During the less than two (2) years that she was incarcerated at FPC Alderson, asthma-related health problems forced her to the infirmary multiple times for medical care or treatment. Ms. Brown reports that her asthma is so severe that she sometimes must go to the hospital and in the past has required nebulizer treatments and intubation. (ECF No. 91, at 10–11; ECF No. 102, at 16.)

Further, Ms. Brown's asthma appears difficult to control despite her apparent diligent attentiveness to her symptoms and her regular use of prescribed medicines and the BOP's provision of them.  Her asthma, for example, is triggered by a wide range of various factors, some of which are simply unavoidable facets of daily life, such as walking and dust. (ECF No. 81, at 9; ECF No. 102, at 16.) Her asthma is also put into high gear when she catches another illness, even a simple cold, because other symptoms can trigger her asthma to act up and make it even more difficult for her to breathe. Ms. Brown testified that she must take "extreme measures" to avoid an asthma attack when she is fighting a cold or other illness. (ECF No. 102, at 17.) And sometimes an asthma attack comes on without warning or explanation. While incarcerated in FPC Alderson, for example, Ms. Brown endured an asthma attack that had no identifiable external trigger. (ECF No. 89-1, at 66.) Consequently, the record demonstrates that no matter the provision and use of various medical interventions by the BOP and Ms. Brown, respectively, Ms. Brown's asthma is essentially uncontrolled in terms of the onset of significant symptoms and in terms of the very real impact it has on her daily living.

Medical records from March 2021 also show that Ms. Brown has a BMI of 32.25. (ECF No. 98-1.) According to the CDC, a BMI of 30.0 or higher counts as "obese." *See About Adult*

11

*BMI*, Ctrs. for Disease Control & Prevention (last updated Sept. 17, 2020), https://bit.ly/2HuhvIL. And as stated above, obesity is another condition that "can" make a person more likely to get severely ill from COVID-19. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Apr. 29, 2021), https://bit.ly/3iZBI5M. Moreover, people who have several underlying health conditions—like moderate to severe asthma and obesity—are at an even higher risk of contracting severe illness from the virus. *See COVID-19: Who's at higher risk of symptoms?*, Mayo Clinic (last updated Apr. 30, 2021), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301.

The Government does not dispute the accuracy of the medical records. (*See* ECF No. 104, at 2.) The Government admits that the "the record supports the conclusion that Ms. Brown has been dealing with" moderate to severe asthma, obesity, and high blood pressure readings, and "[t]hus, the record supports the conclusion that Ms. Brown has more than one medical condition that 'can make [her] more likely to get severely ill from COVID-19.'" (*Id.*; *see also* ECF No. 102, at 80–81.)

Instead, at this juncture the Government's main arguments as to why there are no extraordinary and compelling circumstances for release now focus on: (1) the efforts of Fairview RRC to mitigate the spread of COVID-19, and (2) Ms. Brown's refusal to get the COVID-19 vaccine. For her part, Ms. Brown contends that she is still at risk of contracting COVID-19 at Fairview RRC. She further argues that her decision not to get the vaccine should not be dispositive on her Motion. The Court will address each issue in turn.

Ahead of the hearing, Ms. Brown argued that the living conditions at Fairview RRC were inadequate to prevent the spread of COVID-19 there. She raised multiple concerns, including her belief that staff and residents only wore masks when the Director was present; that residents

congregate around small tables without masks, including during mealtime; that residents must use the bathroom at the same time in the morning; and that there was no social distancing in the computer lab, where residents are required to be for mandatory life skills classes. (ECF No. 96.) Ms. Brown bolstered these arguments in her testimony at the hearing. (ECF No. 102, at 19–22.)

Ms. McCoy, the Director of Fairview RRC, testified for the Government and explained the facility's COVID-19-related health and safety procedures.[4] First, she explained what Fairview RRC is: a reentry center for inmates within six (6) to twelve (12) months of BOP release that helps with transition and prerelease planning before supervised release. (ECF No. 102, at 32.) Case managers assist residents with securing housing and employment, and many of the residents, including Ms. Brown, have outside employment while they are staying at Fairview RRC. (*Id.* at 34–43.) Next, Ms. McCoy testified about the various protocols that Fairview RRC has implemented to mitigate the spread of COVID-19. The facility has the capacity to house sixty (60) residents, but, at the time of hearing, it was housing only eleven (11) residents. (*Id.* at 32.) Fairview RRC provides mandatory and optional life skills classes focused on a variety of topics and featuring outside speakers. (*Id.* at 43–46.) Due to COVID-19, all life skills classes are held on Zoom in the computer lab. (*Id.* at 46.) Fairview RRC has adopted social distancing procedures, such as having the residents eat in shifts and disallowing residents from sharing computers in the computer lab. (*Id.* at 46.) When any individual enters Fairview RRC, they must have their temperature checked and they are asked to wash their hands and use hand sanitizer. (*Id.* at 48.) Fairview RRC has rapid response tests that are administered if anyone experiences COVID-19 symptoms or was knowingly exposed to the virus. (*Id.* at 51.) When a new resident enters Fairview RRC, they must quarantine for at least three (3) days. (*Id.*) Since the beginning of the pandemic,

---

[4] The Court finds the testimony of both Ms. Brown and Ms. McCoy to be credible and will be accepted by the Court.

there have only been two (2) occasions where residents or staff tested positive for the virus. (*Id.* at 53.)

The Court finds these mitigation efforts as they were described as existing at the time of the hearing to be rather comprehensive and salutary. During her testimony before this Court, Ms. McCoy appeared to take seriously the health of her residents and staff, and she seemed attentive to Ms. Brown's concerns, including adjusting social distancing procedures in the computer lab after learning of Ms. Brown's complaints.

But in the Court's view, based on the record that has now been developed, Ms. Brown remains particularly vulnerable to being exposed to COVID-19 and at risk of particularly serious illness were she to contract COVID-19 while at Fairview RRC. For one, according to counsel for Ms. Brown and as confirmed in a post-hearing filing of the Government, (ECF No. 110), Ms. Brown is now assigned by Fairview RRC to live with another resident in a room where social distancing may be quite difficult if not impossible. Ms. McCoy testified at the hearing that residents who have roommates are able to socially distance, (ECF No. 102, at 49), but an examination of the photograph of the room now assigned to Ms. Brown, (ECF No. 106-1), and the Court's application of common sense based on the size of the room depicted in the photograph and the testimony about the course of daily activities at the RRC, would appear to belie that assertion. In any event, it is undisputed that Ms. Brown is now sharing a confined indoor space with and breathing the same air as another individual for hours at a time, every night.[5]

---

[5] This change occurred just a few days after Ms. Brown testified before the Court (and in the presence of Ms. McCoy) about the severity of her asthma and her medically supported concerns about contracting COVID-19. This was in a situation in which the record demonstrates that the facility is operating at about 20% of its normal capacity. The record contains no explanation as to why such was done and done when it was in light of that very low occupancy, particularly given Ms. Brown's demonstrated long-term, persistent, and significant health vulnerabilities.

While there was testimony from Ms. McCoy that even with eleven (11) residents there could be some need for room sharing by someone, what remains unexplained is why in a facility that has the capacity to house sixty (60) residents, when a new resident arrived from a BOP correctional center only a few days after Ms. Brown's testimony

The most recent CDC guidance warns that COVID-19 is transmissible by air in an aerosol form, and that transmission can occur when an infectious person is more than six (6) feet away from another person, especially if the infectious person is exhaling air indoors for more than fifteen (15) minutes at a time. *Scientific Brief: SARS-CoV-2 Transmission*, Ctrs. for Disease Control & Prevention (last updated May 7, 2021), https://bit.ly/3exBMuC. Consequently, notwithstanding the other cautionary actions the Fairview RRC had taken as of the time of Ms. McCoy's testimony, the decision to now place Ms. Brown with her significant health vulnerabilities into the situation now in place appears to the Court to have materially and substantially undercut those other protective measures, certainly at least as to Ms. Brown.

For another, Ms. Brown testified that all residents must be awake and dressed by 8:00 a.m. This arrangement leads to all residents in the bathroom at the same time, brushing their teeth, showering, and otherwise getting ready for the day. (ECF No. 102, at 20.) Ms. McCoy did not address this setup in her testimony. Put together, these situations would allow for the heightened risk of spread within the facility. This is particularly concerning in a facility like Fairview RRC where the residents are working during the day at outside workplaces where the COVID-19 procedures (or perhaps lack thereof) are unknown to Fairview RRC, the parties, or the Court. And,

---

about her health situation in the context of the safety protocols at Fairview RRC, it was Ms. Brown who had her housing status changed.

The reality is that given Ms. Brown's documented health conditions, the consequence of that decision substantially undercuts the otherwise more salutary general health efforts to which Ms. McCoy testified, at least as to Ms. Brown, thereby materially diminishing that factor upon which the Government's argument relies. And, in relation to Ms. Brown's vaccine status, that she has not been vaccinated would not, of course, provide a green light to give anything other than the most serious consideration to Ms. Brown's actual health status in all relevant regards. And for the reasons noted below, at the time that this change was made by Fairview RRC, even if Ms. Brown had received her first vaccine injection, she would not have been considered "fully vaccinated" and would have been directed to maintain infection-prevention measures. The housing decision that was made post-hearing by the RRC does not appear to have been consistent with that guidance.

Ms. McCoy's testimony did not address Ms. Brown's assertion that precautions relative to mask wearing by staff are often honored only in the breach. (*Id.* at 48–49.)[6]

As to Ms. Brown's declining to get the COVID-19 vaccine without an apparent medical or religious basis for that declination,[7] the Court agrees with the Government that this fact would weigh against Ms. Brown's argument that her medical conditions establish extraordinary and compelling circumstances, if those conditions would in fact be mitigated by her being vaccinated. *See United States v. Redman,* No. 10-233, 2021 WL 1737485, at *1 (W.D. Pa. May 3, 2021) (collecting cases); *United States v. Robinson*, No. 16-94, 2021 WL 719658, at *1 (W.D. Pa. Feb. 23, 2021) (finding that a defendant's decision to refuse a COVID-19 vaccine "undermine[d]" the premises of his compassionate release motion).

But this is only marginally so in Ms. Brown's specific case, considering the particular overall circumstances here, namely the intersection of Ms. Brown's health situation, the timing of when she would be eligible to leave the Fairview RRC in any event, and the timing and fact of the housing situation that the RRC has now elected to put in place as to her. Notably, in these regards, Ms. Brown has a home confinement eligibility date of June 4, 2021,[8] which is approximately three (3) weeks from now and in the interim, Fairview RRC elected to materially alter Ms. Brown's housing situation without the record demonstrating the necessity or even basis for doing so and in the face of Ms. Brown's serious health conditions at a time at which she would have still been susceptible to infection even if the vaccination process had begun.

---

[6] Ms. McCoy testified that she would investigate allegations of intermittent mask wearing after the hearing. (ECF No. 102, at 48–49.)

[7] At the hearing, Ms. Brown explained her hesitance to get the vaccine: "The main reason why I did not want to get the vaccine is because I've been watching the news. I've been on Google searching the side effects that the vaccine has caused, and I honestly didn't want any other health issues that I already have going on now." (ECF No. 102, at 58.) She testified that she had never spoken to a medical professional about the vaccine. (*Id.* at 60.)

[8] The record does not contain any information that would indicate that Ms. Brown would not be released to home confinement at that time.

The CDC advises people to "[k]eep taking all precautions until [they] are fully vaccinated," not just until they are partially vaccinated. *See When You've Been Fully Vaccinated*, Ctrs. for Disease Control & Prevention (last updated Apr. 27, 2021), https://bit.ly/2QBRds6. And depending on the vaccine (Moderna, Pfizer, or Johnson & Johnson), it can take up to fifty-six (56) days for a person to be considered "fully vaccinated" even after they receive the first vaccine dose (in the case of the Moderna vaccine, in which the second dose may be administered up to forty-two (42) days after the first dose, coupled with the follow along two-week effectiveness period). *See Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized in the United States*, Ctrs. for Disease Control & Prevention (last updated Apr. 27, 2021), https://bit.ly/3t2Okhx. So, even if Ms. Brown got the vaccine tomorrow, she would still not be fully vaccinated until around the very time she would likely be leaving Fairview RRC (or likely even well after).

In theory Ms. Brown may have been able to get the first dose of the vaccine as early as March 18, 2021. According to Ms. McCoy, Fairview RRC has a vaccine plan in place that allows any resident who wants to get the vaccine to get one from a public source outside of the RRC. (ECF No. 102, at 49–50.) On March 18, 2021, Ms. Brown signed an informed consent form indicating that she declined to be vaccinated at that time.[9] (ECF No. 104-3, at 5.) But even if Ms. Brown received a vaccine the very day that she signed the form declining a vaccine (which the record does not demonstrate would have necessarily occurred), she may not have become fully vaccinated until approximately only three (3) weeks before her home confinement eligibility date.

---

[9] The exact language of the form states: "I decline to be tested at this time." (ECF No. 104-3, at 5.) Ms. McCoy testified that the form contained a typo and that it should have said "decline to be vaccinated," not "decline to be tested." (ECF No. 102, at 52.) It appears to the Court from Ms. Brown's own testimony that Ms. Brown understood that she was declining the vaccine, not a test. (ECF No. 102, at 58–59.)

And it is unclear from the record whether she would have even been able to get the vaccine on March 18, 2021, or if she would have had to wait to a later date to obtain it from an outside source.

And beyond that, even a declination of a vaccination does not then lead to a "green light" for an affirmative reduction in appropriate health precautions by a residential facility. On that point, the record remains blank as to why Fairview RRC decided that it was Ms. Brown out of its limited number of residents who would be placed into a new shared housing situation, or why there was a practical or programmatic reason for that happening so shortly after her testimony before this Court that outlined both her medical situation and her concerns about health safety protocols. And that decision of course was made by and is attributable to Fairview RRC, not by or to Ms. Brown. *See United States v. Gonzalez Zambrano*, No. 18-2002, 2021 WL 248592, at *5 (N.D. Iowa, Jan. 25, 2021) (denying compassionate relief where it was the defendant who had generated the asserted extraordinary and compelling circumstances by declining COVID-19 vaccination).

In the end, even though Ms. Brown's refusal to be vaccinated might in the ordinary course logically cut against her position, the specific circumstances of the situation here, considered as a whole, and in particular the convergence of the release timing and the fact and timing of the housing matters detailed above, nonetheless support a finding that extraordinary and compelling circumstances now exist in this case.[10]

---

[10] The Court does not decide here whether the declination of a COVID-19 vaccination would or would not bar compassionate release relief as a definitional matter, particularly in circumstances dissimilar to those which are now particularly presented by Ms. Brown's specific case. *See United States v. Austin*, No. 15-20609, 2021 WL 1137987, at *2 (E.D. Mich. Mar. 25, 2021), *appeal docketed*, No. 21-1363 (6th Cir. Apr. 14, 2021) (declination of available COVID-19 vaccine is a categorical bar to compassionate release relief).

Whether and how the declination of the COVID-19 vaccine would impact the compassionate release calculus in other cases therefore remains an open question before this Court. The Court observes that there appear to be several factors that would counsel caution in considering a categorical approach as to that issue. First, any sentencing decision is to be individualized to the circumstances of the given case. Second, there may be specific medical or other legitimate reasons that would impact the consideration of the request for relief that would be obviated by a categorical approach. And third, and most apt here, given the potentially relatively long lag time between a first vaccine administration and fully vaccinated status (up to 56 days, or two months), the time that a declining defendant would otherwise need to

The Court notes that publicly available information shows that there has been a recent decline in new COVID-19 cases in Washington, D.C., where Ms. Brown resides, which is a positive development. *See Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES (last updated May 10, 2021), https://nyti.ms/3xVIXo5; *see also More than 20,000 people have died from coronavirus in D.C., Maryland and Virginia*, THE WASH. POST (last updated May 10, 2021), https://www.washingtonpost.com/graphics/local/dc-maryland-virginia-coronavirus-cases/ (noting a 44% decline in new COVID-19 cases in Washington, D.C. in the last week since May 3, 2021).

But at the same time, Ms. Brown has established that she has multiple serious medical conditions, including chronic, moderate to severe asthma that threatens to flare up at any moment and that requires daily treatment and that may put her at high risk of severe illness from COVID-19. Despite Fairview RRC's stated efforts to mitigate the spread of COVID-19 more generally, Ms. Brown has now been placed by the RRC in a living environment where she is likely more vulnerable to contracting the virus, having been recently moved by Fairview RRC into a situation

---

have reached that status may approach or overlap an anticipated release date, making vaccinated status functionally irrelevant.

The Court also does not resolve the likely next issue if the declination of vaccination were considered to be a categorical bar to compassionate release relief: whether a person in federal custody who is offered the COVID-19 vaccine may incur as a consequence of a declination the denial of compassionate release relief based directly on a refusal to be vaccinated, given the current "emergency use authorization" ("EUA") status of each of the COVID-19 vaccines administered in the United States. *See Safety of COVID-19 Vaccines*, Ctrs. for Disease Control & Prevention (last updated Apr. 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html. The administration of a medical product subject to an EUA requires that the recipient be advised in advance of the "consequences" of the refusal to accept administration of the medical product to permit informed consent. *See* 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

The Court is not aware of any cases considering and determining whether the inability to pursue compassionate release relief would be considered to be a "consequence" of a refusal to be vaccinated for the purposes of that provision. *See generally Aviles v. Blasio*, No. 20-9829, 2021 WL 796033, at *23 n.13 (S.D.N.Y. Mar. 2, 2021) (noting but not resolving the impact of EUA status relative to COVID-19 tests in public schools with parental consent); *John Doe No. 1 v. Rumsfeld*, No. 03-707, 2005 WL 1124589, at *1 (D.D.C. Apr. 6, 2005) (noting but not resolving the impact of EUA status as to anthrax vaccines to be administered to members of the armed forces). The record reflects that the consent form involved in this case did not address (one way or the other) the impact of Ms. Brown accepting or declining the COVID-19 vaccine on her compassionate release motion. (ECF No. 104-3, at 5.)

that actually appears to enhance that risk.[11] And Ms. Brown may be at a particularly heightened risk in this specific congregate living environment, considering the most recent CDC guidance that respiratory fluids that carry and transmit the virus may "remain suspended in the air for minutes to hours" at a time and that the virus can be spread beyond six (6) feet. *Scientific Brief: SARS-CoV-2 Transmission*, Ctrs. for Disease Control & Prevention (last updated May 7, 2021), https://bit.ly/3exBMuC. Finally, Ms. Brown will be eligible for home confinement in approximately three (3) weeks,[12] and there are approximately three (3) months before her expected release date from all custody.

Given all of these particularized circumstances and on this specific record, the Court concludes that Ms. Brown has met her burden to establish extraordinary and compelling circumstances for release.

### C.  The § 3553(a) Factors

Even though the Court finds that there is an "extraordinary and compelling" reason sufficient to authorize Ms. Brown's release, it must also consider whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted).

---

[11] The record reflects that should this Court grant Ms. Brown's Motion, she will live with her mother, her mother's husband, and her two (2) children. Ms. Brown testified that her mother and her mother's husband both work from home due to the pandemic, thereby mitigating the risk of COVID-19 spread she would otherwise encounter in her Fairview RRC living environment if she were to be released. (ECF No. 102, at 26.)

[12] The likelihood of Ms. Brown's release to home confinement in less than a month does not necessarily resolve her status in that it appears that such a BOP release could be subject to recission by the BOP. *See* Opinion, *Dep't of Justice Office of Legal Counsel* (Jan. 15, 2021), https://www.justice.gov/olc/opinion/home-confinement-federal-prisoners-after-covid-19-emergency.

The determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion includes the district court's authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, Ms. Brown argues that reducing her custodial sentence to time served would be sufficient but not greater than necessary to achieve the goals of sentencing. (ECF No. 81, at 17.) In particular, Ms. Brown emphasizes that part of her sentence occurred during the pandemic, which made for a "more severe, isolating and punitive" incarceration. (ECF No. 90, at 3.) She also notes her rehabilitative efforts, including GED and parenting classes. (ECF No. 81, at 17.) She intended to enroll in other programming as well, but such was suspended because of the pandemic. (*Id.*)

In response, the Government argues that the sentencing factors continue to support the custodial sentence that the Court originally imposed. First, the Government contends that even a few months of a twenty-four (24) month custodial sentence is a significant portion of Ms. Brown's original sentence. (ECF No. 86, at 16.) Second, the Government argues that, given the vocational and other opportunities at Fairview RRC, the need for the sentence to provide "educational or vocational training" is heightened. (ECF No. 104, at 9 (citing 18 U.S.C. § 3553(a)(2)(D).)

The Court concludes that a reduction of Ms. Brown's custodial sentence is appropriate at this time because the § 3553(a) factors no longer require the sentence that this Court originally imposed. Releasing Ms. Brown to an additional period of supervised release at this point— approximately three (3) weeks before her home confinement eligibility date and approximately

three (3) months before the completion of her custodial sentence—would be highly unlikely to undermine the goals of sentencing. And in fact, the Court finds that requiring Ms. Brown to remain in custody at Fairview RRC for the next few weeks in the living situation in which the RRC has elected to place her would risk such resulting in a sentence that is greater than necessary to fulfill the purposes of sentencing. In the Court's view, that short remaining period of time is essentially immaterial to the overall sentencing equation when considered in the context of the circumstances here, the entire record now before the Court including Ms. Brown's serious medical conditions, and the ability of the Court to impose an additional term of supervised release. Ms. Brown's incarceration began in November 2019. This means that she served the substantial majority of her custodial sentence during the pandemic in a BOP institutional setting, resulting in a different prison sentence than the Court envisioned when it sentenced her.

The Government's observation about the educational and vocational opportunities available to Ms. Brown at Fairview RRC is apt. But the Court notes that Ms. Brown has already benefitted, and to a significant extent, from these services. Ms. Brown is currently employed as a reservation manager at a U-Haul location in Washington, D.C., and she said that Ms. McCoy and the Fairview team were "very supportive" of her as she sought employment.  (ECF No. 102, at 15, 28.) Ms. Brown testified that she will be able to transfer to a U-Haul location closer to her mother's house in Frederick, Maryland, where she intends to live if the Court grants her Motion. (*Id.* at 23.) Thus, it seems that one significant benefit that comes with living in a reentry center such as Fairview RRC—support in securing employment—has already been realized. And the Court has been advised that once Ms. Brown moves to supervised release, she would be supervised in Maryland and would be eligible to benefit from the support and services of the supervising Probation Office.

Thus, the Court finds that the "extraordinary and compelling" nature of Ms. Brown's medical conditions in light of the COVID-19 pandemic is not diminished when considering her situation against the backdrop of the § 3553(a) factors. As such, the original goals of sentencing can and will be carried out as Ms. Brown serves the remainder of her in-custody sentence while on supervised release subject to all conditions of supervised release imposed at the time of sentencing.

## IV.   CONCLUSION

The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). The Court finds that Ms. Brown's Motion is properly before it and that her medical conditions rise to an "extraordinary and compelling" level in light of the COVID-19 pandemic. The Court also finds that the record presently before the Court indicates that release of Ms. Brown at this time (approximately three (3) weeks ahead of her home confinement eligibility date and approximately three (3) months ahead of the end of her custodial sentence) would not undermine the original goals of sentencing in this case such that a sentence modification would be inappropriate.

Accordingly, the Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF Nos. 61 and 81 is hereby GRANTED in that the remainder of Ms. Brown's in-custody sentence will be converted to an additional term of supervised release beginning as the date of the Order implementing the relief directed by this Opinion through and including August 15, 2021, followed by the term of supervised release originally imposed as part

of her original sentence. Each term of supervised release will include all of the conditions of supervised release imposed at the time of sentencing.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

cc:     All counsel of record